**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

———————————————————
                                        :
MARLON GRAHAM, *et al.,*                 :    Case No. 3:18-cv-8616-BRM-DEA
                                        :
              Plaintiffs,                :
                                        :
                                        :
       v.                                :
                                        :         **OPINION**
UNIVERSITY RADIOLOGY GROUP, *et al.,*   :
                                        :
                                        :
              Defendants.                :
                                        :
———————————————————

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendants University Radiology Group ("URG"), Alberto Goldszal ("Goldszal"), Judith Gronlund-Jacob ("Jacob"), Lauree Labaska, ("Labaska") and Deborah Mannings-Lynch ("Lynch")[1] (together, "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 32.) Plaintiffs Marlon Graham ("Graham"), Betty Perry ("Perry"), Daphne Jean-Baptiste ("Jean-Baptiste"),[2] and Anthony Eldridge

---

[1] The Complaint, Caption to the Complaint, and the Docket refer to this Defendant as Deborah Lynch-Manning. (*See* Compl. (ECF No. 1) ¶ 16.) In the Caption for this Motion, Defendants refer to this individual as Deborah Lynch-Manning, but in the Statement of Undisputed Material Facts Defendants refer to her as Mannings-Lynch. (*See* Defs.'s Statement of Facts (ECF No. 32-2) ¶ 9.) In the caption of Plaintiffs' Statement of Undisputed Material Facts, Plaintiffs refer to this Defendant as Manning-Lynch and in text of the Statement itself, Plaintiffs refer to this Defendant as Lynch-Manning, while the Brief in Support of their Motion refers to her as Manning-Lynch (both hyphenated and unhyphenated). (ECF Nos. 33-7 at 1, 5, 24; 33-8 ¶ 2, 5, 24.) The Court employs Defendants' usage of Mannings-Lynch and, on second reference, Lynch.

[2] Daphne Jean-Baptiste entered a Stipulation of Dismissal with prejudice after Defendants' Motion for Summary Judgment was filed. (ECF No. 47.) The other named Plaintiff, Solange Everett, entered a Stipulation of Dismissal with prejudice in March 2019. (ECF No. 18.)

("Eldridge") (together, "Plaintiffs") oppose the Motion. (ECF No. 45.) Also before the Court is Plaintiffs' Motion for Summary Judgment, filed the same day. (ECF No. 33.) This Motion also is opposed. (ECF No. 40.) Having reviewed the submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause appearing, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, while Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs claim they were wrongfully discriminated and/or retaliated against by their employer because of their race in violation of the New Jersey Law Against Discrimination, as amended, N.J. Stat Ann. § 10:5-1 *et seq.* ("NJLAD") and 42 U.S.C. § 1981. Additionally, Graham, individually, claims wrongful discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and the Conscientious Employee Protection Act (N.J. Stat. Ann. §§ 34:19-1, *et seq.* ("CEPA") (Compl. (ECF No. 1) at ¶ 1.)

### A.   Factual Background

Plaintiffs all worked for URG, a Delaware Corporation with a principle place of business in East Brunswick, New Jersey. (*Id.* ¶ 12.) URG provides radiology and other medical-imaging services, and runs, manages, or provides staff for eight regional hospitals and its own twenty-one (21) medical-imaging centers. (Defs.' Statement of Material Facts (ECF No. 32-2) ¶ 2.) URG operates a call center (the "PACS Department") that liaises between its medical-imaging centers and affiliated hospitals. (*Id.* ¶ 3.) The PACS Department operates 24 hours a day through three shifts: shift one from 7 a.m. to 3 p.m., shift two from 3 p.m. to 11 p.m., and shift three from 11 p.m. to 7 a.m. (*Id.* ¶ 4.) Each shift has its own managers and supervisors. (*Id.*)

URG has an Employee Handbook laying out the company's pertinent policies and complaint procedures. (*Id.* ¶ 5.) Each employee receives a copy of the Handbook and signs a receipt acknowledging receipt of the Handbook when they begin working for the company. (*Id.*)

Goldszal is Chief Operating Officer of URG. (*Id.* ¶ 6.) Labaska is Director of Human Resources. (*Id.* ¶ 7.) Jacob manages the PACS Department. (*Id.* ¶ 8.) Lynch is Supervisor of the PACS Department's second shift. (*Id.* ¶ 9.)

Graham was a PACS Analyst from October 20, 2011, until the termination of his employment on August 4, 2017. (*Id.* ¶ 10.) Eldridge has been a PACS Analyst since April 4, 2014. (*Id.* ¶ 12.) Perry has worked for URG since August 2, 2002, and now is assistant supervisor for the third shift at the PACS Department. (*Id.* ¶ 13.) All Plaintiffs are African-American, as is Defendant Lynch. (*Id.* ¶¶ 9, 14.) The Court describes the nature of each Plaintiff's allegations, and the facts relevant to those allegations, in turn.

### i. Graham

Graham alleges intentional discrimination via URG's failure to promote him and underpaying him, failing to provide necessary training, retaliation for protesting discrimination, and creating an oppressive, hostile, intimidating and abusive work environment.

Graham worked on the third shift. (*Id.* ¶ 15.) Regarding URG's alleged failure to provide training, Graham once was Supervisor of that shift, though he does not remember the specific dates (*Id.* ¶ 16 (citing Graham Dep., Defs.' Ex. B (ECF No. 32-5) at 51:7-20).) Graham did not receive FUJI training.[3] (*Id.* ¶ 18 (citing ECF No. 32-5 at 78:21-81:22).) Graham says FUJI was a

---

[3] Neither party defines precisely what this so-called FUJI training is. The little information that is provided indicates it is external, off-site training. (*See* ECF No. 32-2 ¶ 17; ECF No. 1 ¶ 92.) Plaintiffs allege, "PACS Analysts on the third shift who work in FUJI to 'Merge correct images into RIOs for multiple URCS client sides in Fuji URTELE PACS' were not trained" in FUJI. (ECF No. 33-8 ¶ 81 (citing Pls.' Ex. D, Jacobs Dep. (ECF No. 34-3) at 92:5-15; 94:4-7).)

function of the duties of PACS Analysts. (Pls.' Statement of Disputed Material Facts (ECF No. 45-3) ¶ 17.) URG says FUJI training was not required to fill a PACS Analyst position. (*Id.* ¶ 17.) Graham says two employees, Dave Mallon and Steve Higgins, received FUJI training. (*See* ECF No. 33-8 ¶ 81; *see also* ECF-5 at 78:21-81:22.) URG says both have been PACS Administrators. (ECF No. 32-2 ¶ 20 (citing ECF-5 at 78:21-81:22).) Graham says Lynch, who is not a PACS Administrator, has received FUJI training. (ECF No. 45-3 ¶ 20.) URG says FUJI Training is not required for an Administrator position. (ECF No. 32-9.) Graham was never a PACS Administrator. (ECF No. 32-2 ¶ 19 (citing ECF No. 32-5 at 55:17-61:10).) He never applied for a PACS Administrator position. (*Id.*)

In May 2015, URG approved the payment of a so-called shift differential for workers such as Graham. (ECF No. 32-2 ¶ 40 (citing Defs.' Ex. M (ECF No. 32-16)).)

Graham alleges URG discriminates by failing to promote African-American workers. A white employee was promoted to Junior PACS Administrator. (ECF No. 33-8 ¶ 81.) A Junior PACS Administrator position was not internally posted. (ECF No. 32-2 ¶ 22 (citing ECF No. 32-5 at 81:15-86:6).) Plaintiffs say this does not mean no one at URG was able to apply for that position. (ECF No. 45-3 ¶ 22.)

In 2015, Graham applied to be a Project Manager; he was not offered the position. (*Id.* ¶ 23 (citing ECF No. 32-5 at 83:6-94.8).) Graham says his application was never considered and so he could not be offered the position. (ECF No. 45-3 ¶ 23.)

In 2016, Graham was alerted by email that a Project Manager position was open. (*Id.* ¶ 24 (citing ECF No. 32-5 at 83:6-94:8).) He was offered the position, with an annual salary of

---

Defendants contend FUJI Training is not a prerequisite for being hiring as either a PACS Analyst or as a PACS Administrator. (ECF No. 32-2 ¶ 17.) Jacobs testified in her deposition FUJI Training is part of the training received after becoming a PACS Administrator. (*See* ECF No. 34-4 at 94:4-7.)

$80,000.00, but he did not accept the offer. (*Id.* ¶ 25 (citing ECF No. 32-5 83:6-94:8).) Graham says the position went instead to a less-qualified woman of Asian heritage for an annual salary of $120,000. (ECF No. 45-3 ¶ 25.)

Regarding Graham's allegation that URG discriminated by creating an abusive work environment, in August 2016, Graham made a mistake, calling the wrong radiologist at the wrong hospital; a patient died. (*Id.* ¶¶ 26, 27 (citing ECF No. 32-5 at 98:25-102:4, 176:8-15).) Graham disagrees that calling the wrong radiologist and the patient's death were causally related. (ECF No. 45-3 ¶ 27.) On September 12, 2016, Graham met with Jacob and Michael Daley ("Daley"), Graham's supervisor, about this incident. (ECF No. 32-2 ¶ 28.) In the meeting, Graham received a written warning, which he refused to sign; his pay was not withheld. (*Id.* (citing ECF No. 32-5 at 100:17-102:4, 174:22-178:4).)

On September 20, 2016, Graham sent an eight-page memo to Labaska in response to having received a written warning regarding the incident. (*Id.* ¶ 29 (citing ECF No. 32-5 at 176:17-177:1; *see also* Defs.' Ex. J (ECF No. 32-13)).) The Memo was titled, "Objection to Papering my Employee File." (*Id.*) Graham was not punished, nor was his pay affected, for sending this memo. (*Id.*) Graham testified at deposition he complained to human resources at other times, but did not recall details. (*Id.* ¶ 34 (citing Defs.' Ex. G (ECF No. 32-10) at 40:16-41:10).)

Graham alleges URG discriminated against African-Americans by selectively enforcing the policy that workers needed to be on time for beginning their shifts. In July 2017, Graham sent an email to Daley in response to an email a day earlier from Jacob to Daley about staff attendance. (*Id.* ¶ 30.) In the email, Graham at one point stated, "Is [Jacob] guessing at this management thing or watching a time clock is truly the most productive thing she should think of

doing? Or is this simply the sign of a stalled career?" (*Id.* (citing ECF No. 32-5 at 134:21-135:23; *see also* Defs.' Ex. K (ECF No. 32-14)).) URG terminated Graham's employment on August 4, 2017. (*Id.* ¶ 31 (citing ECF No. 32-5 at 153:14-157:24, 159:8-23).)

URG points out that in his deposition, Graham testified no one at URG ever used the "N-word" to his face, which is, "for me where the line would have been" regarding hostile, discriminatory, demeaning or derogatory words. (*Id.* ¶ 35 (citing ECF No. 32-5 at 137:7-140:5).) Graham testified three times that people made comments directly to him about his race. (*Id.*) The first person to do so was Deborah, while explaining to him "what she needs to do to survive as a black employee" and thus "what I may need to do as a black employee." (*Id.* (citing ECF No. 32-5 at 137:7-140:5).) The second person was Jacob, who stated upon learning Graham was pursuing a Project Manager role, stated, "It would be good to see people like you in positions like that." (*Id.* (citing ECF No. 32-5 at 137:7-140:5).) The last was a secretary in the office of a prior CEO, who also stated, while trying to set up an interview for Graham in regards to the project manager role, "It would be good to see faces like yours around here." (*Id.* (citing ECF No. 32-5 at 137:7-140:5).) Graham did not report or complain to Human Resources about these events. (*Id.* (citing ECF No. 32-5 at 137:7-140:5).)

Graham filed a Complaint with the United States Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 32.) That Complaint was administratively dismissed. (*Id.*) The EEOC issued Graham a Notice of Right to Sue on February 2, 2018. (*Id.*)

In May 2018, Graham filed this action. (*Id.* ¶ 33.)

### ii. Eldridge

Eldridge alleges he was denied training, night differential pay and job opportunities, and suffered workplace harassment.

Eldridge was hired by URG in 2014 and became a full-time worker in 2016. (*Id.* ¶ 60 (citing Defs.' Ex. D (ECF No. 32-7) at 47:2-8).) He now is a PACS Analyst. (*Id.* ¶ 61 (citing ECF No. 32-7 at 35:8-37:17, 93:13-95.3).) Eldridge has never applied for or asked for a promotion. (*Id.* ¶ 62 (citing ECF No. 32-7 at 72:11-74:5).) Before 2018, Eldridge had never applied or asked to switch to the first or second shifts. (*Id.* ¶ 63 (citing ECF No. 32-7 at 68:14-19).) Eldridge now receives a shift differential for working on the third shift, but he does not recall when that practice began. (*Id.* ¶ 64 (citing ECF No. 32-7 at 108:23-110:9).) Eldridge says he was denied shift differential for one and a half years because Jacob intentionally did not process it. (ECF No. 45-3 ¶ 64.)

In 2014, Eldridge worked with Lynch on the weekend shift. (*Id.* ¶ 65 (citing #CF No. 32-7 at 27:16-18).) He did not socialize with Lynch because "She has a very distasteful and unpleasing manner. Not just with me, but with other staff there." (*Id.* ¶ 66 (citing ECF No. 32-7 at 26:22-27:3).) Eldridge says Lynch verbally abused him during a 2014 "code stroke" incident while he was on the phone gathering information. (*Id.* ¶ 67 (citing ECF No. 32-7 at 29:21-31:15).) Eldridge reported this incident to his supervisor, Graham, by phone and via written and oral statements to Human Resources. (*Id.* ¶¶ 68, 69, 71 (citing ECF No. 32-7 at 31:16-32:8, 32:17-33:1).) A conversation Eldridge had with Human Resources regarding this incident was his first with Labaska. (*Id.* ¶ 71 (citing ECF No. 32-7 at 38:22-39:7).) As a result of the incident, Lynch received a written warning and a one-day suspension, and within a week was moved to the second shift. (*Id.* ¶¶ 72-73 (citing ECF No. 32-7 at 35:8-36:16, 122:4-17).) Eldridge no longer worked directly with Lynch after this. (*Id.* ¶ 74 (citing ECF No. 32-7 at 37:18-24).) At the same time Lynch was transferred, Eldridge was offered a position on the third shift. (*Id.* ¶ 73 (citing ECF No. 32-7 at 35:8-36:16, 122:4-17).)

Regarding allegations of a hostile work environment, Eldridge points to a 2015 incident that began when Goldszal received an email from a physician complaining about conversation with Eldridge in which a "dangerous mistake" was made that resulted in a "delay in patient care." (*Id.* ¶ 85 (citing Defs.'s Ex. P (ECF No. 32-20).) In reply, Goldszal said he would follow up on the complaint, and stated that the problem likely resulted from "a combination of: (a) sleeping at the wheel (=do not like my job), (b) lack of training and/or (c) lack of oversight/supervision." (*Id.* (citing ECF No. 32-20).) Goldszal forwarded the email exchange to five (5) PACS managers and supervisors, with instructions to help Eldridge "navigate through the system." (*Id.* (citing ECF No. 32-20).) Eldridge was not disciplined over this incident, nor did he lose any pay. (*Id.* (ECF No. 32-7 at 84:14-16).) Eldridge testified at deposition the forwarding of the email constituted a "public reprimand." (*Id.* (citing ECF No. 32-7 at 120:5-121:14).)

In a 2016 incident, Goldszal received an email from a physician complaining about a phone conversation he had with Eldridge, who he characterized as "inflexible, not very friendly and not helpful at all." (*Id.* ¶ 77 (citing Defs.' Ex. O (ECF No. 32-18)).) Goldszal replied, "this must be one of the new employees, but no excuse of his attitude. He may not understand the job. We will either provide the appropriate training and get the appropriate performance, or just replace the staff." (*Id.* (citing ECF No. 32-18).) Goldszal also sent an email to three PACS managers and supervisors, and a member of what the company calls its Informatics Department, stating, in part, "Can someone call the CC today and address the issue [with Eldridge] below. Seems he does snot [sic] know the job." (*Id.* (citing ECF No. 32-18).) Eldridge was not disciplined as a result of this incident, nor did he lose any pay. (*Id.* (citing ECF No. 32-7 at 132:19-133:2).)

At three meetings with Labaska and Martinez, Eldridge complained about the emails from Goldszal (*Id.* ¶ 85 (citing ECF No. 32-7 at 84:17-85:2).) In June 2018, nearly three months after the last of these meetings, Eldridge received a written summary of findings and conclusions from Labaska. (*Id.* ¶ 86 (citing ECF No. 32-7 at 109:22-24); *see also* Defs.' Ex. Q (ECF No. 32-20).) The summary reports Eldridge was dissatisfied because the third shift consisted only of black employees; the third shift was not receiving a shift differential; that he did not receive enough training; and that there was fear of retribution for speaking out. (*Id.* ¶ 87 (citing ECF No. 32-20).) In the summary, Labaska says Eldridge was assured in those meetings that his issues would be investigated. (*Id.* (citing ECF No. 32-20).) From that investigation, the summary states, the following was determined: that there was "insufficient evidence to conclude that any actions or conduct by URG or its staff constitute unlawful conduct." (*Id.* (citing ECF No. 32-20).)

### iii. Perry

Perry alleges she was denied employment opportunities, as suffered discrimination, a hostile work environment, and failure to receive equal pay. Perry was hired in 2002, and from 2010 to 2018 she worked on the second shift. (*Id.* ¶¶ 88-89 (citing Defs.' Ex. E (ECF No. 32-8) at 6:14 to 7:16, 9:1-23).) At some point, Lynch recommended Perry for the position of Assistant Supervisor for the second shift; Perry declined the offer. (*Id.* ¶ 90 (citing ECF No. 32-8 at 68:13-69:24).) Perry voluntarily transferred to the third shift. (*Id.* ¶ 91 (citing ECF No. 32-8 at 69:25-70:12).) In 2018, Perry was promoted to Supervisor for the third shift. (*Id.* ¶ 92 (citing ECF No. 32-8 at 13:14-20).) URG says Perry had not held a supervisor position at URG before this promotion. (*Id.* ¶ 93 (citing 32-8 at 40:12-15).) Perry says she was selected and promoted to PACS Daily Operations Manager and demoted three years later, in 2009, to PACS assistant,

without notice or reasons. (ECF No. 45-3 ¶ 93 (citing Perry Cert. (ECF No. 33-4) ¶ 3.) She never

applied for a supervisory position. (ECF No. 32-2 ¶ 94 (citing ECF No. 61:16-23).)

 With the promotion came an increase in pay. (*Id.* ¶ 96 (citing ECF No. 32-8 at 13:14-

14:11).) In a January 2018 email to Jacob, Perry expressed dissatisfaction with the size of the pay

increase. (*Id.* ¶ 97 (citing Defs.' Ex. R (ECF No. 32-21)).) Perry says the increase was not the

same as the increase offered to Kim Fletcher, the other assistant supervisor. (ECF No. 45-3 ¶ 96

(citing ECF No. 33-4 ¶ 11).) Perry met with Jacob in January to discuss her new position and the

pay increase. (ECF No. 32-3 ¶ 98 (citing ECF No. 32-21).) Following that meeting, Perry sent an

email thanking Jacob for giving her time to consider the promotion and stating that she was

"honored to continue in this, new role, as the assistant supervisor of the overnight shift." (*Id.* ¶ 99

(citing ECF No. 32-21).) Six months later, Perry received another pay increase, in accord with

URG policy that new employees and employees transferring to new positions are reviewed after

six months and after one year." (*Id.* ¶ 100-01 (citing Defs.' Ex. S (ECF No. 32-22); ECF No. 32-

8 at 13:14-14:11).) Perry did not complain to anyone in Human Resources again about her rate

increase. (*Id.* ¶ 102 (citing ECF No. 32-8 at 29:21-30:23).) URG says Perry received a shift

differential for working on the third shift, though she does not recall when she began receiving it.

(*Id.* ¶ 103 (citing ECF No. 32-8 at 28:1-15).) Perry says she did not receive shift differential

while working either for the second shift or the third shift. (ECF No. 45-3 ¶ 103 (citing ECF No.

33-4. ¶ 34).)

 Perry testified at deposition she had volunteered to Judy for on-call duty—meaning

working from home on weekends and being responsible for issues that arise then—but "I wasn't

granted that privilege." (ECF No. 32-2 ¶¶ 104-105 (citing ECF No. 32-8 at 32:1-33:18).) Perry

testified she spoke to Judy about not getting on-call duty, Judy responded she spoke with Mary

Lou, who had seniority on the first shift, and "they went through and decided that I wasn't qualified to take on-call." (*Id.* ¶ 105 (citing ECF No. 32-8 at 33:19-35:13).) Perry later received an email outlining the reasons why she was not considered qualified to work on-call. (*Id.* ¶ 106 (citing ECF No. 32-8 at 35:14-21).) When asked recently to work on-call, Perry declined. (*Id.* (citing ECF No. 32-8 at 33:19-35:13).)

Perry did not receive performance evaluations for a period of time. (*Id.* ¶ 107 (citing ECF No. 32-8 at 77:24-79:5).) Perry says that period of time was three years. (ECF No. 45-3 ¶ 107 (citing ECF No. 33-4 ¶¶ 20-25).) She brought this to URG's attention, received retroactive pay for this period excepting one year, because she had failed a URG exam. (ECF No. 32-2 ¶ 107 (citing ECF No. 32-8 at 77:24-79:5).) Perry says she failed Jacob's exam, not URG's exam, and she objected to the conditions Jacob created under which the exam was administered. (ECF No. 45-3 ¶ 107 (citing ECF No. 33-4 ¶¶ 20-25).) Perry has received a raise for every year except for the year she failed the exam. (ECF No. 32-2 ¶ 108 (citing ECF No. 32-8 at 77:24-79:5).)

At some point, Perry had a confrontation with Lynch. (*Id.* ¶ 109.) The confrontation came after an incident in which Lynch had sent patient information to the wrong physician during the third shift. (*Id.* (citing ECF No. 32-8 at 36:3-37:24).) In response to the error, Lynch changed procedures for keeping track of nightly on-call physicians. (*Id.* (citing ECF No. 32-8 at 36:3-37:24).) Perry's discussion about her dissatisfaction with the need for this procedural change was overheard. (*Id.* (citing ECF No. 32-8 at 36:3-37:24).) Perry says she was told she was insubordinate "because I addressed my opinion and they tell me that I was talking to loud. I was in the midst of all of my co-workers and they said they shouldn't have heard the conversation." (*Id.* (citing ECF No. 32-8 at 36:3-37:24).) Perry was not disciplined, nor did she lose any pay over this confrontation with Lynch. (*Id.* ¶ 110 (citing ECF No. 32-8 at 38:2-8).)

In September 2016, Lynch sent an email to the second shift workers she supervised to request they send her an email when going on a break and when they return, so she can keep track of breaks. (*Id.* ¶ 111 (citing Defs.' Ex. T (ECF No. 32-23)).) Perry responded to the email, twice characterizing the request with a profanity, and stating, "I take my break EVERYDAY at 7 p.m, later if someone comes back from their dinner late or if I'm in the middle of something pertaining to work." (*Id.* ¶ 112 (citing ECF No. 32-23).)

Perry sent another email that same month, this time to Jacob, with the subject line: "Harassment Complaint." (*Id.* ¶ 113 (citing ECF No. 32-23).) In the email, Perry complained about harassment she had received from Lynch regarding dinner breaks. (*Id.* (citing ECF No. 32-23).) Perry requested that Jacob "kindly look into this matter" and "take suitable action," or direct her to the proper human resources person to resolve this matter. (*Id.* (citing ECF No. 32-23).) Perry did bring the incident to human resources, where it was addressed by Labaska. (*Id.* ¶ 114 (citing ECF No. 32-8 at 38:9-39:8).) Perry testified the policy was directed at all workers on the second shift and that at some point it ended, also for everyone on that shift. (*Id.* ¶ 115 (citing ECF No. 32-8 at 40:1-11).) Perry testified she had no further problems with Lynch after she transferred to a different schedule, the third shift. (*Id.* ¶ 116 (citing ECF No. 32-8 at 56:16-17).) Perry says she complained at least twice to Goldszal about the way Lynch and Jacob spoke with co-workers. (*Id.* ¶ 117 (citing ECF No. 32-8 at 42:25-45:2).)

At some point, Jacob made everyone in the PACS Department a salaried employee except for Perry. (*Id.* ¶ 119 (citing ECF No. 32-8 at 50:4-21).)

Perry never personally heard Jacob tell Marlon Carandang, a native of Hawaii or other Pacific island, he could arrive late and leave early from work. (*Id.* ¶ 120 (citing ECF No. 32-8 at 53:18-54:6).) Perry testified she never spoke to Labaska or anyone in Human Resources about

Jacob's behavior toward her. (*Id.* ¶ 121 (citing ECF No. 32-8 at 54:10-56:1).) Perry says she spoke with Goldszal about circumstances in the PACS Department, while Cindy Dumphy of Human Resources knew Jacob was refusing to evaluate Perry. (ECF No. 45-3 ¶ 121 (citing ECF No. 33-4 ¶¶ 44, 117).)

Neither Jacob nor Lynch ever made offensive or harassing comments directly to Perry. (ECF No. 32-2 ¶ 122 (citing ECF No. 32-8 at 45:20-25).) Perry says Jacob and Lynch made harassing, discriminatory or offensive comments about her behind her back. (*Id.* ¶ 123 (citing ECF No. 32-8 at 46:1-47:12).) Perry knows this because she heard about these comments from other co-workers. (*Id.* (citing ECF No. 32-8 at 46:1-47:12).) One time several co-workers, so-called transcriptionists, asked, referencing Jacob, "What did you do to your boss?" (*Id.* (citing ECF No. 32-8 at 46:1-47:12).) When Perry asked what they meant, they responded, "Well, she was in the lunchroom talking about you with two of your co-workers . . . and she wasn't quiet about it. She was talking loud enough for everyone to hear." (*Id.* (citing ECF No. 32-8 at 46:1-47:12).) URG employees from other departments also told Perry that Jacob talks about Perry. (*Id.* (citing ECF No. 32-8 at 46:1-47:12).) Jacob has not made comments about Perry's race, but these people relay comments making clear Jacob doesn't not like Perry. (*Id.* (citing ECF No. 32-8 at 46:1-47:12).)

Perry testified that though the Complaint alleges that Perry openly criticized URG's discriminatory actions—such as denial of employment opportunity, hostile work environment, outright racial discrimination, equal pay and retaliation—and suffered as a result of her forthrightness, "I probably didn't speak to anybody about it." (*Id.* ¶ 124 (citing ECF No. 32-8 at 58:14-59:3); (*see also* ECF No. 1 at 80).) Plaintiffs say these were discriminatory actions from which Perry suffered. (ECF No. 45-3 ¶ 124.)

Perry has not looked for employment elsewhere because, "I love URG, I love my job." (*Id.* ¶ 125 (citing ECF No. 32-8 at 77:4-6).)

### B. Procedural History

Plaintiffs filed this 16-count Complaint on May 1, 2018 alleging violations by all Defendants of 42 U.S.C. § 1981 (Counts 2, 4, 7, 11 and 14), the New Jersey Law Against Discrimination ("NJLAD") (Counts 3, 6, 9, 13 and 16), for intentional discrimination, hostile work environment, retaliation, and, against the individual Defendants, aiding and abetting employment discrimination. (ECF No. 1 at 21-38.) Six counts were brought by Graham only, alleging violations of Title VII (Counts 1, 5, 8, 10, 12 and 15) for intentional discrimination, hostile work environment, retaliation, and, against the individual Defendants, aiding and abetting employment discrimination, as well as violations of the New Jersey Conscientious Employees Protection Act against URG (Count 10). (*Id.*)

Following an extended discovery period, Defendants filed this Motion on October 3, 2019. (ECF No. 32.) Plaintiffs filed opposition to Defendants' Motion on November 18, 2019. (ECF No. 45.)[4] Defendants filed their Reply on November 20, 2019. (ECF No. 46.)

Also on October 3, 2019, Plaintiffs filed their Motion for Summary Judgment. (ECF No. 33.)[5] Defendants filed opposition to that Motion on November 4, 2019. (ECF No. 40.)

---

[4] Plaintiffs' Opposition on the docket is titled "Certification in Opposition." In a letter to the Court, Plaintiffs request that the Court accept a Memorandum of Law submitted in support of Plaintiffs' Summary Judgment Motion to also serve as their Brief in Opposition to Defendants' Motion. (*See* ECF No. 45; *see also* ECF No. 38.)

[5] While Plaintiffs filed a Brief in Support of their Motion on October 3, 2019, that Brief was incomplete. (*See* ECF No. 33-7.) Plaintiffs refiled their Brief in Support of their Motion, without comment or notice, on October 15, 2019. (ECF No. 38.)

## II.    LEGAL STANDARD

Summary judgment is appropriate if materials in the record show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materials in the record include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### III.   DECISION

Defendants argue the Court should grant summary judgment because Plaintiffs' claims "are wholly unsubstantiated" and "self-serving statements that . . . are simply not enough to sustain the claims that they raise," while Plaintiffs counter the Court should grant summary judgment to them because "a plethora of facts exist from a which a jury can reasonable [sic] find that URG intentionally denied [Plaintiffs] equal employment opportunity based upon race." (*See* ECF No. 32-1 at 1; ECF No. 38 at 8.)

All Plaintiffs allege claims under the NJLAD and 42 U.S.C. § 1981, while Graham also alleges four claims under Title VII and one claim under CEPA.

"The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 256–57 (3d Cir. 2017) (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009)). Similarly, the "[a]nalysis of a claim under the NJLAD follows that of a claim under Title VII." *Teubert v. SRA International, Inc.*, 192 F. Supp. 3d 569, 574 (D.N.J. 2016) (citing *Schurr v. Resorts Intern. Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999)). "All . . . discrimination claims brought under Title VII and the NJLAD . . . are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Marino v. Westfield Bd. of Educ.*, No. 16-00361, 2017 WL 216691, at *5 (D.N.J. Jan. 18, 2017).

The *McDonnell Douglas* framework has three basic steps. First, the plaintiff must put forward a *prima facie* case of race or national origin discrimination by a preponderance of the

17

evidence. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). "Once a plaintiff makes a prima facie case of discrimination," the analysis moves to the second step: "the burden shifts to the [defendant] to provide a legitimate, nondiscriminatory reason for its actions." *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir. 2012). "If the defendant does so," the analysis proceeds to the third step: "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If each party meets its burden at each stage, summary judgment is inappropriate. *Whishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). A party's failure to meet its burden may justify summary judgment. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215 (3d Cir. 2011).

Each step in the framework requires its own separate analysis. The first stage—where Plaintiffs make a *prima facie* case of discrimination—Plaintiffs must show: (1) they belong to a protected class, (2) they are qualified for the position, (3) they suffered an adverse employment action, and (4) the circumstances support an inference of unlawful discrimination. *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018). Among the circumstances that support an inference of unlawful discrimination are if nonmembers of the protected class receive more favorable treatment than plaintiffs under similar circumstances. *Sarullo*, 352 F.3d at 797 n.7 (noting that an inference of discrimination arises if the employer's actual or attempted treatment of similarly situated employees outside the protected class is more favorable than the employer's treatment of the plaintiff). "The elements of [the] prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *Geraci v. Moody-Tottrup Int'l*, 82 F.3d 578, 581 (3d Cir. 1996). However flexibly the Court must apply these elements, a plaintiff must nonetheless establish her *prima*

*facie* case by a preponderance of the evidence. *Sarullo*, 352 F.3d at 797.

With regard to the second stage—the requirement for the defendant to articulate legitimate, nondiscriminatory reasons for its actions—Defendants need only "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Defendants have only a "burden of production"—that is, Defendants "need not prove that the tendered reason *actually* motivated [their] behavior." *Id.*

At the third stage—where the Plaintiffs' obligation is to demonstrate the pretextual nature of Defendants' explanation—the analysis "focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). Plaintiffs may meet their burden in several ways: by "show[ing] that [defendant] has previously discriminated against [the plaintiff], that [defendant] has previously discriminated against other persons within the plaintiff's protected class, or that [defendant] has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

Because the analytical framework is the same whether claims arise under Title VII, 42 U.S.C. § 1981, and the NJLAD, the Court will consider all the claims arising for Graham together, while separately considering the claims common to all Defendants.

### A. Graham

Graham is the only Plaintiff bringing claims under Title VII, which "prohibits employers from engaging in discrimination on the basis of race, color, religion, sex or national

origin." *Atkinson v. LaFayette College*, 460 F.3d 447, 453–54 (3d Cir. 2006) (citing 42 U.S.C. § 2000e–2).

Prior to filing his Title VII suit, Graham was required to exhaust all his administrative remedies. The failure to do so "is an affirmative defense in the nature of statute of limitations." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). "Under Title VII, a charge of race discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice." *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001). The 180-day deadline is extended to 300 days when the plaintiff lives in a so-called deferral state, such as New Jersey and Pennsylvania. *Scocozza*, 2014 WL 6674453, at *4. (citing 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); *Cardenas v. Massey*, 269 F.3d 251, 255 n.2 (3d Cir. 2001)). The EEOC must investigate the charge "and the complainant must allow a minimum of 180 days for the EEOC investigation to proceed." *Burgh*, 152 F.3d. at 470. If the EEOC has not resolved the charge after 180 days, it must advise the plaintiff through a "right-to-sue" letter "that it sees no reason to take action on the complaint." *Id.* (citations omitted). A plaintiff cannot bring a Title VII suit without having first received a right-to-sue letter. *Id.* (citation omitted).

If the plaintiff does choose to bring a Title VII action, "it must be filed within 90 days of the date on which the complainant has notice of the EEOC's decision not to pursue the administrative charge." *Id.* (citing 42 U.S.C. § 2000e-5(f)(1)). The start of 90-day period is generally triggered by the date the plaintiff receives the right-to-sue letter. *Id.* (citing *Seitzinger v. Reading Hosp. and Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999); *Mosel v. Hills Dept. Store, Inc.*, 789 F.2d 251, 252 (3d Cir. 1986)).

"Both the 180-day period for filing the administrative complaint and the 90-day period

for filing the court action are treated as statutes of limitations." *Id.* (citation omitted). The Third Circuit strictly construes these periods and has held that "even one day late is time-barred and may be dismissed." *Id.* The statute of limitations, however, does not begin to run unless there has been "final agency action," such as the EEOC issuing a right-to-sue letter. *Id.* at 470-71. Without "final agency action," a plaintiff cannot bring suit. *Id.*

Graham was terminated on August 4, 2017, and filed a charge with the EEOC on October 17, 2017, well within the 300-day period provided by 42 U.S.C. § 2000e-5(f)(1). The EEOC's right-to-sue letter was dated in February 2018.[6] (ECF No. 1 ¶ 4.) Accordingly, the Court concludes Graham timely brought his Title VII claims.

### i. Failure to Promote

Graham argues Summary Judgment is appropriate because he has established a *prima facie* case of intentional discrimination for URG's failure to promote him to Project Manager in 2015 and 2016, as well as for an assistant project manager position, under Title VII, NJLAD and § 1981. (ECF No. 38 at 24.)

To make a *prima facie* case of discrimination for failure to promote, Graham must bring forth evidence that he: 1) is a member of a protected class; 2) was qualified for the position at issue; 3) was not promoted; and 4) URG filled the spot with a similarly situated applicant who was not of his protected class. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)).

---

[6] The Complaint puts the date of the EEOC letter, which it calls Notice of Suit Rights, at February 2, 2018; Plaintiffs' Brief in Support of their Motion, which calls the EEOC communication a Right to Sue letter, states the letter was dated February 22, 2018. (*Compare* ECF No. 1 ¶ 4 *with* ECF No. 38 at 7.) As the Complaint was filed on May 1, 2018, it matters not whether the right-to-sue letter was dated February 2 or February 22 as either means the Complaint was filed within the required 90 days from notice of that letter that expired May 3, 2018.

For the purposes of the Title VII, NJLAD and § 1981 claims, it is undisputed Graham, as an African-American, satisfies the first *prima facie* prong for each of the three failure-to-promote claims: he is a member of a protected class. Defendants do not dispute Graham satisfies the second prong for all three of these claims: that he was qualified for the position as Project Manager. The Court therefore considers only the remaining elements of the *prima facia* prong and the *McDonnell Douglas* burden-shifting analysis for Graham's claims.

### 1. 2015 Project Manager Application

The third *prima facie* prong asks if Graham was not promoted.

Defendants argue Graham was not "not promoted" in 2015 because the company did not post the position internally and was considering only outside candidates. (ECF No. 32-2 ¶ 23). Because the company was considering only outside candidates, Defendants contend, Graham was ineligible and therefore could not be offered the position, and, as a result, could not have been rejected for the position, and, it follows, that this does not fit the "not promoted" criteria. (ECF No. 32-2 ¶ 23 (citing ECF No. 32-5 at 83:6-94.8).) Defendants infer that in this Graham was treated no different than any other internal employee, none of who were considered for this position. Accordingly, Defendants argue, Graham's intentional discrimination claim regarding the 2015 Project Manager position must fail and summary judgment granted to Defendants, because Graham admits no URG employees, not just URG's African-American employees, were able to apply. (ECF No. 32-1 (citing ECF No. 32-2 ¶¶ 15-25).)

Plaintiffs contend Graham actually was rejected for the 2015 Project Manager position because, though it was posted only for external candidates, that does not mean internal candidates could not apply. (ECF No. 45-3 ¶ 22.) In fact, Plaintiffs argue, Graham did submit an application in February 2015. That application was marked by URG "to be forwarded to the

proper location." (ECF No. 38 at 25 (citing Graham Cert. (ECF No. 33-3) ¶ 10); *see also* Pls.'
Ex. A (ECF No. 45-9), labeled Application Information, at 5).)

Graham makes two different arguments about the 2015 Project Manager position. First,
he contends he was illegally not promoted because his application was never considered and so
he could not be offered the position. (ECF No. 45-3 ¶ 23.) He also maintains he was illegally
rejected, something he learned after the position had been filled when his "inquiry about his
application revealed he was rejected for the position." (ECF No. 38 at 26 (citing Graham Cert.
(ECF No. 45-8) ¶¶ 2-3.) Graham testified in his deposition that in an after-the-fact interview
Goldszal "offered no explanation" about the 2015 position, and Graham didn't being up the
subject because "As a PACS analyst I'm not gonna ask the CIO to explain what you did. That
doesn't work in corporate." (ECF No. 32-5 at 86:21-24.)

It is indisputable that Graham was not elevated to the Project Manager position.
However, what is in dispute is whether Graham actually applied for the position. Graham
maintains he submitted an application that was routed through channels to the "proper location,"
meaning that he was not promoted as contemplated by the *McDonnell Douglas* burden-shifting
test and so his not being promoted satisfies the third *prima facie* prong. However, URG argues
no internal candidates were considered, and therefore Graham wasn't "not promoted" as required
for making his *prima facie* case.

The Court concludes from this there is a genuine dispute about a material fact over
whether Graham was not promoted. As a result of this genuine dispute, Graham has not made a
*prima facie* case of discrimination for failure to promote. However, even assuming Graham
could make a *prima facie* case, summary judgment would be inappropriate for Defendants
because that same genuine issue of material fact in dispute means URG cannot carry its burden

of showing a nondiscriminatory reason for failing to promote Graham in 2015. Accordingly, both Plaintiffs' and Defendant's summary judgment motions are **DENIED** regarding a failure-to-promote claim related to the 2015 Project Manager application.

## 2.   2016 Project Manager Application

There is no disputing Graham satisfies the prongs for establishing a *prima facie* case of intentional discrimination for the failure to promote over his 2016 application to be promoted to Project Manager: (1) as an African-American he is a member of a protected class; (2) defendants do not argue he was not qualified for the position at issue, in fact URG offered him the position; (3) he was not promoted; and (4) URG filled the spot with a similarly situated applicant who was not from his protected class. (*See* Pls.' Statement of Disputed Facts (ECF No. 45-3) ¶ 25 (stating URG hired an Asian woman at a salary of $120,000.00).)

When plaintiffs make a *prima facie* case of discrimination, the *McDonnell Douglas* analysis moves to the second step in which Defendants have the burden of establishing a "legitimate, nondiscriminatory reason" for its actions. *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir. 2012).

Defendants argue there was a legitimate, nondiscriminatory reason for Graham not being promoted: he was not denied any employment opportunity on the basis of his race, rather, he turned down the promotion. (ECF No. 32-1 at 6.) The Court concludes Defendants have satisfied their burden of establishing a legitimate, nondiscriminatory reason for Graham's failure to be promoted in 2016. That means, "the inference of discrimination drops and the burden shifts back to [Graham] to show 'URG's] proffered reason is merely pretext for intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Plaintiffs counter that Graham rejected the offer because that offer was for an annual salary of $80,000.00, while the person hired to fill that same position in 2015 was a white woman who received an annual salary of $110,000.00, and the person who ultimately filled the position in 2016 was an Asian woman who received an annual salary of $120,000.00. (ECF No. 38 at 25-27; *see also* ECF No. 45-3 ¶ 25.) Graham infers racial discrimination animated URG's so-called lowball offer to him, arguing, "These facts offered to a reasonable jury would find that URG and Goldszal failed to hire and promote Graham because of his race." (*Id.* at 27.)

The Court observes three additional facts: when Graham applied for the Project Manager position in 2015, he listed his desired salary as $90,000.00[7] (Pls.' Ex. A at ECF No. 45-9); Goldszal indicated in an email to Human Resources the offer to Graham was potentially more than $80,000.00 (Goldszal Email, Pls.' Ex. C at ECF No. 45-9 (where Goldszal wrote, "I sincerely believe we have made a great initial offer: $80K/yr and some adjustment at year-end based on his 6-mo performance review"); and both the $110,000 and $120,000 salaries paid to those hired for the Project Manager position were well below the $135,000 Graham says he earned between his URG position and a second job he also held (ECF No. 32-5 at 92:10-13).

The law is clear: if Graham meets his step three burden of showing URG's explanation is pretextual, summary judgment will not issue to either Plaintiffs or Defendants because when each side meets its burden at each stage of the *McDonnell Douglas* analysis, summary judgment is inappropriate. *Whishkin*, 476 F.3d at 185. Summary judgment also is not appropriate for Plaintiffs if Graham has failed to meet his third-step burden. However, even assuming Graham could make a *prima facie* case, summary judgment would be inappropriate for Defendants because that same genuine issue of material fact in dispute, namely whether URG's offer was

---

[7] As a PACS Supervisor, Graham earned about $49,000.00 a year when he was terminated. (ECF No. 38 at 25 (citing Graham Cert. (ECF No. 45-8) ¶ 1).)

lowballed and whether that lowball offer was the result of racial animus, means URG has not carried its burden of showing a nondiscriminatory reason for failing to promote Graham. Accordingly, the Court concludes both Defendants' and Plaintiffs' Motions for Summary Judgment are **DENIED** on Graham's failure-to-promote claim as it pertains to the 2016 Project Manager position.

### 3.  Assistant Project Manager Position

Graham alleges that in the after-the-fact interview in 2015, Goldszal promised to create an Assistant Project Manager position. However, Graham alleges, the offer came with conditions, such as giving up his PACS Supervisor position, training his successor, that the position would be part-time, and that he would continue to assist the PACS department. (ECF No. 38 at 12 (citing ECF No. 33-3 ¶¶ 12-18).) Graham declined the offer and returned to the PACS Department, only now, having given up his Supervisor position, as an Analyst. (*Id.*)

Plaintiffs contend summary judgment should be granted to Graham because these facts establish a *prima facie* case of discrimination for failure to promote. Defendants counter that summary judgment should issue for Defendants because a *prima facie* case for failure to promote requires that Graham had to have actually applied for a position that was available. (Defs.' Br. in Opposition to Pls.' Mot. (ECF No. 40) at 9 (citing *Bermingham v. Sony Corp. of Am.*, 820 F. Supp. 834 (D.N.J. 1992)).

Defendants argue not only did Graham not apply for the Assistant Project Manager position, but also that the position never actually existed before Goldszal offered to create it specifically for Graham. (*Id.* (citing *Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009) (stating that a "subjective expectation that [the employer] would create and entirely new position for [the employee] (and [the employee] alone) cannot support a prima facie case"

of discrimination or retaliation).) Furthermore, Defendants contend, the failure to promote an employee to a nonexistent position "is not enough to support a presumption of intentional . . . discrimination." (*Id.* (citing *Young*, 359 F. App'x at 310 (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004)).)

Plaintiffs do not respond to Defendants' arguments.

In *Bermingham*, the plaintiff contended changes in his position at the defendant corporation to executive vice president from president constituted an actionable failure-to-promote claim under § 1981. 820 F. Supp. at 854. This Court concluded plaintiff could not state a *prima facie* case of discrimination for failure to promote because plaintiff did not allege he had applied for an available position for which he was rejected. *Id.*

*Bermingham* requires the same result here, as Graham has not alleged he applied for an available Assistant Project Manager position nor that he was rejected for this position. Rather, he alleges facts showing that he rejected an offer of promotion to a newly created position for which he did not apply. Graham has not stated a *prima facie* case for discrimination for failure to promote as to the Assistant Project Manager position pursuant to Title VII, § 1981 and NJLAD. Accordingly, Plaintiffs' Motion for Summary Judgment for failure to promote related to the Assistant Project Manager position is **DENIED**, while Defendants' Motion related to this position is **GRANTED.**

### ii.   Retaliation

Graham seeks summary judgment on his Title VII, § 1981 and NJLAD claims that URG illegally retaliated against him because of his race. Defendants contend summary judgment should issue to them because Graham has not carried the burden of establishing a *prima facie* case for discriminatory retaliation.

The Court considers two theories of retaliation inferred from Plaintiffs' arguments. The first is that Graham's rejection of the Project Manager offer caused URG to retaliate by punishing him for a common operational error and then firing him for speaking out against URG's alleged discriminatory enforcement of shift on-time policies and discriminatory workplace climate conditions. The second retaliation theory considered by the Court is that URG's reaction to the emails themselves constituted illegal and discriminatory retaliation.

To establish a *prima facie* case of retaliation under Title VII, Graham must show: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citing *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)). The burden is similar for § 1981 retaliation, though the first prong for that claim is that Graham must show he engaged in activity protected by § 1981, here meaning racial discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451-52 (2008). For his NJLAD claim, Graham must show he engaged in activity protected by the NJLAD, which casts a wider net of protected classes, though in this litigation the attention focuses on racial discrimination. (*See* N.J. Stat. Ann. 10:5-12(a).[8] However, Graham's CEPA claim precludes his NJLAD claim, as the New Jersey Supreme Court has construed N.J. Stat. Ann. § 34:19-8 as barring litigants

---

[8] Specifically, the NJLAD lists the following as protected statuses: "the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J. Stat. Ann. § 10:5-12(a).

who have instituted a CEPA claim from pursuing either a separate state law claim for retaliatory discharge, or any other state law claim that requires the same proofs as those needed to satisfy a CEPA claim. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 803 (3d Cir. 2010) (citing *Young v. Schering Corp.,* 660 A.2d 1153, 1160–61 (N.J. 1995)). Thus, the Court considers only Graham's Title VII and § 1981 retaliation claims, and Graham's NJLAD retaliation claim is dismissed. Because CEPA protects a wider variety of activity, the Court will examine the CEPA claim separately.

Under the first theory, Graham fails to make a *prima facie* case of retaliation pursuant to Title VII and § 1981 because he alleges the retaliation was for his rejection of URG's offer of a promotion to Project Manager.

The Third Circuit has defined the meaning of "protected activity" contained in the first prong for a retaliation claim:

> [T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause"). *Slagle v. County of Clarion,* 435 F.3d 262, 266 (3d Cir. 2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Clark County v. Breeden,* 532 U.S. 268, 271, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir.1996) (retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a violation existed").

*Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006), *as amended* (Sept. 13, 2006).

Rejecting an offer of employment is not activity protected by Title VII or § 1981. Even assuming as true Graham's inference that the lowball offer reflected racial discrimination, his

rejection of that offer did not make that point. Instead, the email Graham sent to reject the offer stated that he "regrettably" declined the $80,000.00 offer because he felt it did not reflect his current market value, did not reflect the importance of the position, and would represent a significant reduction in his current earnings (because he would have to relinquish a second job he had). (*See* Graham's Ex. C (ECF No. 45-9) at 1-2.) There is no indication in this email that Graham held an objectively reasonable belief, in good faith, that an activity he opposed in rejecting the offer is unlawful under Title VII as required or contemplated by *Clark County*.

As Graham cannot make a *prima facie* case of retaliation under his first theory, the Court turns to his argument that the URG's illegal retaliation was a reaction not to the rejection of a job offer but rather two Graham emails.

### 1. August 22, 2016 Incident

In the first example of retaliation, Graham points to an email he sent to senior URG executives and managers with the title "Objection to papering my employee file" in the subject line. (ECF No. 32-13.) This email was sent in response to a written warning placed in Graham's employment file related to the August 22, 2016 phone call handled by Graham in which a physician was sent to the wrong hospital, and a patient later died. (*See* ECF No. 32-12.)

Defendants argue "Graham does not, and cannot, point to any document showing that he complained about racial discrimination." (ECF No. 40 at 33.) As to the email dealing with the events of August 2016, the Court agrees.

A review of this email makes clear Graham was not "engaged in activity protected by Title VII" as contemplated by *Moore*. Graham was not reacting to activity protected against by Title VII, meaning reacting to discrimination, nor was his writing the email a protected activity. Similarly, Graham was not reacting to activity protected against by § 1981. Rather,

Graham was writing in response to a written warning placed in his employment file. That written warning was a five-paragraph memo generated by Jacob and dealing entirely with the facts of the phone call from the hospital at the center of this incident. (*Id.*) The bottom of the warning contained the following: "In this case, the omission of hospital name had an impact on the patients' care and could have been avoided. Should there be another incident, it will lead to additional disciplinary action, up to and including separation of employment from URG." (*Id.*)

Graham responded with an eight-page email making a variety of accusations and conclusions, calling a warning for a common operational failure "simple skullduggery," but nowhere stating, or even inferring, that he believed URG was singling him out him because he was African-American. In fact, Graham states, "many presently employed at URG, especially those belonging to those mostly directly responsible for patient case [sic] would have been littered with countless reprimand and accounts of intolerable, poor, and unacceptable behavior and hob [sic] performance." (ECF No. 38 at 33.) Defendants note that URG did not discipline Graham for sending this email, or withhold any pay. (ECF No. 32-2 ¶ 29.)

A review of the warning memo leads to the conclusion Graham was being warned about the phone call. Graham does not allege that the "many presently employed" who could be similarly warned would be comprised totally or even partly by African-American workers, or even by any worker from any protected class. Rather, he makes only the sweeping statement that many URG workers probably had similar experiences in making mistakes during phone calls from physicians. Furthermore, nowhere does Graham allege he was singled out for a written warning because he is African-American. Because Graham has not established he was engaged in activities protected by Title VII, he has not stated a *prima facie* case of discriminatory retaliation over the memos dealing with this incident. Accordingly, Plaintiffs' Motion for

Summary Judgment for retaliation related to the August 2016 email is **DENIED**, while Defendants' Motion related to this email is **GRANTED**.

### 2.   July 27, 2017, Email

In the second email example, Graham sent a July 27, 2017, email written in response to a Supervisor's inquiry over late starting times on the third shift. Defendants seek summary judgment, arguing Graham cannot point to any email complaining about racial discrimination. (ECF No. 40 at 33.) Moreover, Defendants argue, even taking Graham's allegations as true, the July 27, 2017, email, reacting to what management portrayed as chronic lateness by members of the third shift, is not the type of protected activity contemplated by Title VII. Graham counters that the email was protected activity because he "reiterated one of the central complaints of all plaintiffs, the double standard of the application of shift start times" and well as temperature conditions that were in violation of the Employees Handbook. (ECF No. 38 at 33; *see also* ECF No. 45-9 at Ex. C.)

The July 27, 2017 email was Graham's response to Daley about an email a day earlier from Jacob to Daley regarding staff attendance. (*Id.* ¶ 30.) In the July 27 email, Graham stated, "Is [Jacob] guessing at this management thing or watching a time clock is truly the most productive thing she should think of doing? Or is this simply the sign of a stalled career?" (*Id.* (citing ECF No. 32-5 at 134:21-135:23; *see also* Defs.' Ex. K (ECF No. 32-14)).) URG terminated Graham's employment on August 4, 2017. (*Id.* ¶ 31 (citing ECF No. 32-5 at 153:14-157:24, 159:8-23).) Defendants characterize Graham's email as "unprofessional" and "insubordination," and proffer that it was for these offenses, not retaliatory discrimination, Graham's employment at URG was terminated. (ECF No. 32-1 at 7.)

Considering the 2017 email, it is clear there is a genuine issue of material fact in dispute—namely whether Graham was "engaged in activity protected by Title VII" as contemplated by *Moore*. Plaintiffs contend Graham was voicing a central complaint of workers on the third shift: that company rules against lateness were being enforced in a discriminatory manner, and about climate-control issues affecting workers on a third shift entirely comprised of African-Americans. Defendants argue Graham's memo did not charge unfair treatment based on race. The Court observes that these "central complaints" constituted just two lines in the middle of a lengthy communication. Nonetheless, because there is a genuine issue of material fact in dispute, both summary judgment motions are **DENIED** as to Graham's retaliation claim related to the 2017 email.

### iii.   Hostile Work Environment

Graham seeks summary judgment on his hostile work environment claim pursuant to Title VII, § 1981, and the NJLAD. To establish a hostile work environment claim under Title VII, Graham must prove: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Hamera v. Cty. of Berks*, 248 F. App'x 422, 424 (3d Cir. 2007).

Graham argues the first prong is satisfied because he, like the other Plaintiffs, experienced intentional discrimination because of their race in the form of the segregation of African-American employees in the third shift, where they experienced disparate treatment in URG's denial of training, the denial of promotion opportunities, failure to evaluate, and the company's selective enforcement of shift starting times. (ECF No. 38 at 40.)

Regarding the denial-of-promotion opportunities, the Court already has concluded Graham failed to make a *prima facie* cases for failure to promote regarding the 2015 Project Manager position and the Assistant Project Manager position, while there is a genuine issue of material fact in dispute over whether he can make a *prima facie* case for this retaliation claim focusing on the 2016 Project Manager position and if URG made a lowball offer to Graham out of discriminatory animus. Therefore Plaintiffs' Motion for Summary Judgment for a hostile work environment related to Graham's failure-to-promote claim is **DENIED**, while Defendants' Motion related to this Graham claim also is **DENIED**.

### iv.   CEPA Retaliation Claim[9]

The Court now turns to Graham's claim that URG's termination of his employment was discriminatory retaliation in violation of CEPA.

CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging" in such activity. *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994). CEPA provides, in relevant part, that:

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:

---

[9] Plaintiffs argue Eldridge also has a valid CEPA claim. (*See* ECF No. 33 at 44.) Defendants contend the CEPA claim, which is contained in Count 10, pleads a CEPA violation only as to Graham. (ECF No. 40 at 27 n.3.) The heading for Count 10 reads, "By Plaintiff Graham against Defendant URG." (ECF No. 1 at 30.) Count 10 alleges, "the retaliatory hostile work environment and conduct described herein would not have occurred but for Plaintiff's complaints submitted to URG, regarding Graham's respective refusal to participate in race discrimination." (*Id.* ¶ 77.) All references contained in Count 10 refer either only to Graham or only refer to the singular noun form for Plaintiff. (*Id.* ¶¶ 75-84.) As a result, the Court concludes the CEPA claim alleges a cause of action only as to Graham, and the Court will not conduct a CEPA inquiry as to Eldridge's arguments in Plaintiffs' Brief.

> (1) is in violation of a law, or a rule or regulation promulgated
> pursuant to law . . .
> (2) is fraudulent or criminal . . . or
> . . . .
> c. Objects to or refuses to participate in any activity, policy or
> practice which the employee reasonably believes:
> (1) is in violation of a law, or a rule or regulation promulgated
> pursuant to law [;] . . .
> (2) is fraudulent or criminal; or
> (3) is incompatible with a clear mandate of public policy
> concerning the public health, safety or welfare or protection of the
> environment.

N.J. Stat. Ann. § 34:19–3.

To succeed on a CEPA claim, a plaintiff must prove four elements: (1) that the plaintiff reasonably believed the employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him; and (4) that the whistle-blowing activity caused such adverse employment action. *See Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999); *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). CEPA covers employee complaints about activities the employee reasonably believes are: (i) in violation of a specific statute or regulation; (ii) fraudulent or criminal; or (iii) incompatible with policies concerning public health, safety or welfare or the protection of the environment. *See Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 550 (N.J. 2000). However, "CEPA does not require that the activity complained of . . . be an actual violation of a law or regulation, only that the employee 'reasonably believes' that to be the case." *Id.* at 552.

In CEPA, as in the other statutory claims, once a plaintiff has established a *prima facie* case, courts continue to step two of the *McDonnell Douglas* burden-shifting analysis.

Graham contends summary judgment should issue on his CEPA claim because his memo "specifically referenced the temperature conditions in violation of the Employees Handbook"

and, Graham allegedly believes, tied the temperature conditions to a violation of state law. Defendants counter that CEPA "is intended to protect those employees whose disclosures fall sensibly within the statute; it is not intended to spawn litigation concerning the most trivial or benign employee complaints." (ECF No. 40 at 29 (quoting *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 558 (2013)).) Even taking Graham's allegations as true, Defendants argue the July 2017 email "is not the type of protected activity contemplated by CEPA." (*Id.* at 30.)

The Court concludes that whether Graham was fired in retaliation over Graham's engagement in the protected activity of objecting to what he believed was racially discriminatory conditions at URG or whether his firing was motivated by an unprofessional, derogatory and insubordinate email from Graham "is precisely the type of factual dispute that is inappropriate for summary judgment." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 242 (3d Cir. 2016). Accordingly, both summary judgment motions are **DENIED** as to the CEPA claim. The Court now will examine the counts common to all Plaintiffs.

**B. Intentional Discrimination Against All Plaintiffs**

Plaintiffs seek summary judgment on their claims pursuant to the NJLAD and § 1981: intentional discrimination for failure to promote; harassment and discrimination; hostile work environment; and retaliation against both URG and the individual Defendants; as well as aiding and abetting discrimination against the individual Defendants. The Court will consider each category of claims in turn.

**i.    Intentional Discrimination for Failure to Promote**

The Court begins with Plaintiffs' allegations of discrimination via a failure to promote.

As stated above, to state a *prima facie* case of discrimination for failure to promote, Plaintiffs must show they: 1) are a member of a protected class; 2) were qualified for the position

at issue; 3) were not promoted; and 4) URG filled the spot with a similarly situated applicant who was not of their protected class.

At a January 2018 town meeting of URG staffers, Eldridge told senior executives URG was discriminating against African-American employees by not posting job vacancies, resulting in supervisors failing to select African-American workers for employment opportunities. (ECF No. 38 at 15.)

It is undisputed that Plaintiffs, as African-Americans, are members of a protected class. However, outside of Graham, Plaintiffs have not presented any evidence about qualifications for any particular promotion. In fact, Eldridge alleges URG discriminated against him by its failure to properly train PACS employees working on the third shift, an allegation to be discussed more fully below but that infers Eldridge was not qualified for any particular promotion. Eldridge does not allege he has been rejected for any promotion, nor does he allege URG filled a job with a similarly situated applicant who was not of his protected class. In short, Eldridge has not shown three of the four prongs required to make a *prima facie* case for discrimination by failure to promote.

Perry also cannot establish a *prima facie* failure-to-promote case. Perry worked on the second shift from 2010 to 2018 (ECF No. 32-2 ¶¶ 88-89 (citing Defs.' Ex. E (ECF No. 32-8) at 6:14 to 7:16, 9:1-23).) At some point, Lynch recommended Perry for the position of Assistant Supervisor for the second shift, though Perry declined the offer. (*Id.* ¶ 90 (citing ECF No. 32-8 at 68:13-69:24).) Perry voluntarily transferred to the third shift. (*Id.* ¶ 91 (citing ECF No. 32-8 at 69:25-70:12).) In 2018, Perry was promoted to Supervisor for the third shift. (*Id.* ¶ 92 (citing ECF No. 32-8 at 13:14-20).) In other words, because Perry actually rejected one offer of

promotion and accepted a second offer of promotion, she cannot make a *prima facie* case for failure-to-promote discrimination.

Finally, the Court already has concluded Graham failed to either make a *prima facie* case for failure to promote or that there is a genuine issue of a material fact in dispute relevant to his making a *prima facie* case. Nonetheless, the Court observes that the fact that the 2015 Project Manager position was limited to outside candidates tends to support Plaintiffs' claims, while the internal posting of the 2016 Project Manager position to which Graham responded tends to undermine this same claim.

Defendants argue Plaintiffs' inference of intentionally, racially disparate treatment over job postings is insufficient because Plaintiffs have not alleged "white employees were advised about job openings and black employees were not." (ECF No. 40 at 11.) Instead, Defendants contend, Plaintiffs allege some jobs were not posted at all. (*Id.*) This contention supports Eldridge's complaints made at a January 2018 open house, at which he informed URG executives and supervisors he has not applied for any URG position because most jobs are not posted and, as a result, he did not know when any jobs were available. (Eldridge Ex. E (ECF No. 45-6).) Countering that narrative are Jacobs' deposition testimony about the fluidity of workers moving between shifts and that she made third-shift workers aware of openings for other shifts. (ECF No. 34-3 at 84:2-16.)

In short, Plaintiffs have not carried their burden of establishing a *prima facie* case of discrimination for failure to promote because there are genuine issues of material fact in dispute relevant to this inquiry. However, summary judgment also is inappropriate for Defendants because that same genuine issue of material fact in dispute, namely whether URG's offer was lowballed and whether that lowball offer was the result of racial animus, means URG has not

carried its burden of showing a nondiscriminatory reason for failing to promote Graham in the event Plaintiffs made their *prima facie* case. Accordingly, both Summary Judgment Motions are **DENIED** on Plaintiffs' failure-to-promote claims.

### ii.   Hostile Work Environment

To establish a hostile work environment claim for retaliation under § 1981, Plaintiffs must prove: "(1) [they] suffered intentional discrimination because of [their] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [them]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Hamera v. Cty. of Berks*, 248 F. App'x 422, 424 (3d Cir. 2007). "[I]solated incidents (*unless extremely serious*) will not amount to [harassment]." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998)). Similarly, under the NJLAD Plaintiffs must establish that the complained-of conduct "(1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African–American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 545 (D.N.J. 2018) (citing *Taylor v. Metzger*, 706 A.2d 685 (1998) (quoting <u>Lehmann v. Toys R Us, Inc.</u>, 626 A.2d 445 (1993) (modifications in original).

Plaintiffs argue summary judgment should be granted because "the conduct alleged by plaintiffs is pervasive to only black employees, and . . . Defendants offered no evidence to support otherwise." (ECF No. 38 at 41.) Defendants counter that Plaintiffs' claims are legally unsustainable. (ECF No. 40 at 21.)

Plaintiffs point to the following as "discrete acts" that created a hostile work environment for African-American employees at URG: a failure to train; selective enforcement of shift start-time policies; segregation of African-American employees to the third shift; climate-control policies that create hazardous working conditions for third-shift workers. The Court will address each in turn.

### 1.   Failure to Train

Plaintiffs allege URG fails to provide adequate training for African-American workers both for the positions they currently hold and that would enable them to be more qualified for other positions in the company. Eldridge alleges he informed executives and managers after the January 2018 town hall meeting that the lack of training for black employees, mostly third-shift employees, was spearheaded by Jacob and Lynch (ECF No. 38 at 15 (citing Eldridge Cert. (ECF No. 45-7) ¶¶ 8-11, 22). Eldridge informed Labaska that white employees receive PACS training for two to three months, while he had not received any PACS training or any formal, professional training related to the duties of what he calls are these highly skilled medical service operators. (*Id.* ¶¶ 10, 13). Specifically, Eldridge identified two white employees as receiving "adequate training and were promoted." (ECF No. 38 at 28.)

Defendants assert that the training referred to by Eldridge is so-called FUJI training, and that the two named white employees received FUJI training in connection with their roles as PACS Administrators, not as PACS analysts. (ECF No. 40 at 12.) Defendants contend Graham has even testified as such. (*Id.* (citing ECF No. 32-5 at 78:21-81:22).) Defendants further contend that FUJI training is not a prerequisite for a PACS Administrator position. (*Id.* (citing URG Job Description for PACS Administrator position, Defs.' Ex. H (ECF No. 32-11)).) Defendants maintain that, while Plaintiffs allege FUJI training is a requirement of their PACS Analyst

positions, "Plaintiffs do not produce any documents supporting these assertions. The plain language of the PACS Analyst job description . . . demonstrates that FUJI training is not a prerequisite for the PACS Analyst position." (*Id.* at 13-14 (citing URG Job Description for PACS Analyst, Defs.' Ex. F (ECF No. 32-9)).)

The Court concludes Plaintiffs have not carried their burden of establishing a *prima facie* case of discrimination for failure to train because there are genuine issues of material fact in dispute relevant to this inquiry. For instance, the claims of Eldridge and Graham that they were denied training opportunities tends to support Plaintiffs' allegations, while the fact that Lynch, who is African-American, did receive FUJI training tends to undermine Plaintiffs' allegations. In other words, the failure-to-train factual disputes do not support a grant of summary judgment for either party on the hostile work environment claims. Accordingly, both Plaintiffs' and Defendants' Motions for Summary Judgment related to the failure to train are **DENIED.**

### 2. Selective Enforcement of Shift Start Times

Plaintiffs contend URG creates a hostile work environment by arbitrarily and selectively enforcing shift start times against the African-American workers that comprise the third shift, while first and second shift workers who are white "utilize the start grace time." (ECF No. 38 at 15 (citing ECF No. 45-8 ¶¶ 14-16).) In other words, African-American workers on the third shift are penalized for coming in late for work while white workers on other shifts are not penalized. Plaintiffs specifically claim URG refused to enforce the shift start time for Alex Braverman, a white employee. (ECF No. 38 at 9.) The Complaint alleges "Braverman, a PACS Analyst, is chronically late by more than 30 mins but [Jacob] openly admitted that the [late time] policy does not apply to him." (ECF No. 1 ¶ 41.)

Defendants counter that Plaintiffs have not supported their allegations "by citing to particular parts of material in the record," instead, "Plaintiffs simply offer self-serving statements." (ECF No. 40 at 15-16.) Specifically, Defendants maintain "Plaintiffs do not produce any time-cards of white employees, nor do they produce any documentary or testimonial proof establishing that white employees are permitted to arrive at work late." (*Id.* at 16.)

Defendants argue Graham testified he never received a written warning for being late, Eldridge testified "he was never disciplined and never lost pay as a result of arriving to work late," while "Perry testified that she never personally heard anyone at URG tell certain employees that they could come to work late. (*Id.* (citing ECF Nos. 32-5 at 24:4-23; 32-7 at 77:7 to 78:3; and 32-E at 53:18-54:6).)

The Court concludes Plaintiffs have not carried their burden of establishing a *prima facie* case of a hostile work environment stemming from the selective enforcement of shift start times because there are genuine of issues of material fact in dispute relevant to this inquiry. Accordingly, both Plaintiffs' and Defendants' Motions for Summary Judgment related to the selective enforcement of shift start times are **DENIED.**

### 3.   Segregation of African-Americans in the Third Shift

Plaintiffs contend URG creates a hostile work environment by making the third shift comprised exclusively of African-Americans. (ECF No. 38 at 7.) Plaintiffs refer to this as the "segregation of African-Americans" from employees who are white or represent other protected groups. (*Id.* at 20.) Plaintiffs further allege this discriminatory segregation spanned the entire careers of Graham and Eldridge, while Perry joined the segregation unit in 2017. (*Id.* at 40.) Plaintiffs infer that this dynamic makes possible the unequal treatment of African-Americans they have experienced at URG (ECF No. 38 at 21), makes possible the alleged denial of training

(*id.* at 30), keeps them from being promoted (*id.* at 35), and keeps them on a shift burdened by an unsafe workplace marked by cold office temperatures in the winter and hot office temperatures in the summer.

Defendants counter that the "mere fact that the third shift is comprised of black employees is not 'per se' indicative of disparate treatment" and "Plaintiffs have not proffered any evidence of a discriminatory intent to only hire black employees for the third shift." (ECF No. 40 at 11.) Therefore, Defendants argue, Plaintiffs cannot make a *prima facie* case of hostile work environment for the fact that the third shift has only African-American employees. Moreover, Labaska testified all PACS Analysts are hired based on their qualifications, and those qualifications apply equally to all applicants. (ECF No. 34-3 at 22:10-13.)

The Court agrees Plaintiffs have failed to make a *prima facie* case that the so-called segregation of African-Americans on the third shift is indicative of disparate treatment and that Plaintiffs have not brought forth evidence that having only African-American employees on the third shift is the result of any discriminatory animus. The Court also observes, for instance, that Jacob testified at deposition about a certain fluidity among shift workers who have transferred between shifts. (ECF No. 34-4 at 84:2-7.) Also, Labaska testified in her deposition that for her report on the Town Hall meeting Eldridge told her he had never applied for a position on the first shift for personal reasons. (ECF No. 34-2 at 22:14-23:1.) Meantime, Lynch and Daphne Jean-Baptiste, though no longer a Plaintiff in this litigation, worked on the second shift; both are African-American. (ECF No. 38 at 28.) Accordingly, Plaintiffs' Motion for Summary Judgment related to the so-called segregation of African-Americans on the third shift is **DENIED**, while Defendants' similar Motion is **GRANTED**.

#### 4.   Climate control

Plaintiffs allege URG created a hostile work environment through the hazardous working conditions experienced by third-shift employees in the form of heat that did not work in the winter and air conditioning that did not work in the summer, and that these conditions were ignored by URG and its administrators. (ECF No. 45-8 ¶¶ 52-55.)

Defendants maintain Plaintiffs' argument is countermanded by the testimony of Eldridge, who admits he is unaware of the working conditions on other shifts. (ECF No. 32-7 at 127:2-21; *see also* ECF No. 45-8 ¶ 57.)

The Court agrees Plaintiffs have not made a *prima facie* case of hostile work environment caused by the temperature issues identified by Plaintiffs. The Court notes, for instance, that Labaska testified that heating and cooling issues have plagued all the shifts, and that URG has a "process for dealing with the temperature." (ECF No. 34-2 at 37:1-13.) Accordingly, Plaintiffs' Motion for Summary Judgment related to climate control issues is **DENIED**, while Defendants' similar Motion is **GRANTED**.

#### 5.   Failure to Pay Shift Differential

Plaintiffs contend URG created a hostile environment by denying shift differential pay to workers on the third shift. Defendants counter that Plaintiffs' NJLAD claims regarding shift differential are time-barred because "[d]ocumentary evidence . . . demonstrates that URG approved payment of shift differential to the 3rd shift in May 2015, or approximately three years before this action was filed in May 2018. (ECF No. 38 (citing ECF No. 32-16; *see also* ECF Nos. 32-10 at 55:17-61:10; 32-5 at 108:23-110:9; and 32-11 at 23:1015).) The Jacob email establishing this time period for fixing the shift-differential issue expressly names Graham and Eldridge. (ECF No. 32-16.) Defendants also argue that Plaintiffs' § 1981 claims regarding shift-

differential nonpayment fail because Plaintiffs have not established a race-based reason for the initial failure to pay the shift differential.

The Court agrees that any shift-differential claim pursuant to the NJLAD is time-barred because the NJLAD has a two-year statute of limitations as applicable to the operative facts of this litigation. *See Martinez v. Nat'l Broadcasting Co.*, 877 F. Supp. 219, 230 (D.N.J. 1994). The Court also concludes Plaintiffs have failed to make a *prima facie* case of a hostile work environment owing to the failure to pay shift differential because Plaintiffs have failed to demonstrate shift differentials were not paid out of discriminatory animus, or even that this failure only affected African-American workers, as the Jacob email referred to above states, "We have this in place for the second shift and should now be doing it for the third shift." (ECF No. 32-16 Ex. M.) Accordingly, Plaintiffs' Motion for Summary Judgment related to shift differentials is **DENIED**, while Defendants' similar Motion is **GRANTED**.

### 6.  Unequal Treatment

Plaintiffs allege URG creates a hostile work environment in part through its unequal treatment of similarly placed white and African-American employees, where white employees who commit errors on the job are not publicly reprimanded, humiliated or singled out, while Plaintiffs have been.

Defendants counter that Plaintiffs have failed to offer evidence supporting these claims, relying instead only on their own "self-serving" statements. (ECF No. 40 at 22) Defendants contend, for instance, that Perry's claim that Lynch and white co-workers are not reprimanded by Jacob when they make the same mistakes relies solely on her statement. (*Id.* (citing ECF No. 45-10 ¶ 10).) Furthermore, Defendants maintain, Perry's claim is weakened by the fact that her statement includes Lynch as among those who do not get reprimanded for mistakes, and Lynch is

African-American. (*Id.*) Defendants argue that most of Perry's claims do not implicate race. (*Id.*)
As one example, Defendants maintain Perry's statement that Jacob "gave me the cold shoulder,"
is a treatment "not based on race." (*Id.* (citing ECF No. 45-10 ¶ 17).) Defendants argue Perry's
claim that she did not receive a performance appraisal for nearly three years not only is not based
on race, but also is countermanded by the fact that when URG learned of this Perry received
performance evaluations and retroactive pay. (*Id.* (citing ECF Nos. 45-10 ¶ 18; ECF No. 32-7 at
77:24-79:5).) Similarly, Defendants contend Perry's claim that all PACS workers save her were
made salaried workers is not an allegation based on race and is countermanded by her
certification stating that all PACS employees received this treatment, not just white workers. (*Id.*
(citing ECF No. 45-10 ¶ 25).) Finally, Defendants argue Perry's claims that four years ago she
was denied the same opportunity to work "weekend on-call" duty granted to co-workers does not
implicate race, and Perry admits she was told initially this denial was based on a determination
she was not qualified for weekend on-call duty. (*Id.* (citing ECF No. 45-10 ¶ 26).) Also,
Defendants contend, Perry was offered the opportunity to work weekend on-call more recently,
but turned down the offer to spend more time with her children. (*Id* (citing 32-7 at 32:1-35:13).)

Defendants argue claims of unequal treatment by Eldridge also fail because they do not
implicate race. (*Id.* at 22-23.) For example, Defendants contend an email Eldridge claimed
"malign[ed] my character by calling my behavior 'unprofessional,'" among other comments, was
not based on race but rather was a statement contained in an email Goldszal wrote following a
complaint Goldszal had received from a doctor stating that in a recent phone call Eldridge had
been "inflexible, not very friendly and not helpful at all." (*Id.* (citing ECF Nos. 45-7 ¶ 21; 45-6,
Pls.' Ex. C).)

The Court agrees with Defendants that Plaintiffs have failed to make a *prima facie* case for the claim that unequal treatment of African-American employees compared with their white co-workers constitutes a hostile work environment pursuant to the NJLAD and § 1981, because Plaintiffs have not proffered any evidence the claimed unequal treatment was motivated by or implicated racial hostility. Accordingly, Plaintiffs' Motion for Summary Judgment regarding unequal-treatment claims are **DENIED**, while Defendants' corresponding Motion is **GRANTED**.

### 7.   Failure to Promote/Post Open Positions

Plaintiffs allege URG created a hostile work environment for African-American workers by failing to post open positions at the company and failing to promote African-American employees. Defendants maintain Plaintiffs' failure-to-post/failure-to-promote claims fail because Eldridge has never applied for nor asked for a promotion at URG, while Perry actually has been promoted, in 2018, to Third Shift Assistant Supervisor, and, as discussed, Graham rejected the 2016 offer to be Project Manager. (ECF No. 40 at 14-15.) Furthermore, the failure-to-post claims fail, Defendants argue, because Plaintiffs do not allege a racially disparate treatment in the form, say, of advising white employees about job postings but not advising African-American workers about job openings. (*Id.* at 12.) Instead, Defendants contend "Plaintiffs allege that the jobs were not posted at all, for any employee—black, white or other—to see." (*Id.*)

The Court agrees Plaintiffs have not stated a *prima facie* case that URG created a hostile work environment by failing to promote African-American workers because they were African-Americans, or that URG failed to post available job opportunities.

While the Court concludes Plaintiffs have not made a *prima facie* case that any category of the alleged discrete acts Plaintiffs claim constitute a hostile work environment, when

analyzing "the elements of a hostile work environment claim, the record must be evaluated as a whole to decide whether" Plaintiffs have proved their case. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001).

The Court determines that in failing to make a *prima facie* case regarding the individual discrete acts discussed above, Plaintiffs also have failed to make a *prima facie* case when evaluating the record as a whole, as there are too many instances in which Plaintiffs have failed to proffer evidence beyond their own statements to support claims that the treatment they complain about of arose because of their race or was markedly different from the treatment of non-African-American co-workers.

Nonetheless, Defendants have not carried their burden of showing that the evidence brought by Plaintiffs is "insufficient to establish an essential element of the nonmoving party's claim," *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). As discussed above, there exist between the parties genuine issues of material facts in dispute, facts required to establish those elements. Accordingly, both Defendants' and Plaintiffs' Motions for Summary Judgment are **DENIED**.

### c.  Retaliation

Plaintiffs seek summary judgment on their retaliation claims pursuant to NJLAD and § 1981. Plaintiffs contend Eldridge's report to superiors of abusive conduct by Lynch in 2014 stalled his career, keeping him in the third shift ever since. (ECF No. 38 at 36.) Plaintiffs contend Jacob's withholding of Perry's differential pay for two years was in retaliation for Perry's complaint in 2014 to Dr. Epstein, instead of to Jacob, about the lack of salary increases she had received for years. (*Id.* at 37.)

To establish a retaliation claim under § 1981, Plaintiffs

> must show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]."

*Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted)). In a § 1981 claim, Plaintiffs must show the discrimination suffered was because of an activity or status protected by § 1981. *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). In a NJLAD claim, Plaintiffs must show they "opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]" *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009).

Defendants contend Eldridge's retaliation claim fails because, while his complaint following the Town Hall meeting in January 2018 constitutes a protected activity pursuant to § 1981, he does not allege an adverse employment action has been taken against him. (ECF No. 38 at 34.)

The Court agrees Eldridge has not experienced any adverse employment action since the 2018 Town Hall meeting. However, Plaintiffs contend the retaliation experienced by Eldridge was the stalling of his career after he reported abusive conduct by Lynch toward Eldridge in 2014. (ECF No. 38 at 36 (citing ECF No. 32-2 ¶ 58 (citing ECF No. 32-7 at 29:21-31:15).) The genesis of Eldridge's complaint about Lynch's conduct does not implicate race, but rather Eldridge's perception of Lynch as possessing "a very distasteful and unpleasing manner." (ECF No. 32-7 at 27:1-2.) In this 2014 incident, Eldridge complained to his third-shift supervisor, Graham, that Lynch was shouting at him as he was taking a call and putting information into the

49

computer. (*Id.* at 29:21-31:15.) However, the reporting of one's superior for verbally abusive conduct is not an activity protected by § 1981 or the NJLAD. Therefore, any perceived stalling of his career is not retaliation covered by the NJLAD. And even if Eldridge in 2014 was engaged in protected activity, he has not established a causal connection between his complaint about Lynch and the fact that he has not been promoted in the five years since his complaint. As discussed above, Eldridge testified he has not applied for any jobs on other shifts or promotions since arriving at URG.

Plaintiffs contend URG retaliated against Perry because of Perry's complaint lodged in 2014 to Dr. Epstein that she had not received merited annual salary increases owing to Jacob's inaction. (ECF No. 38 at 35.) As with Eldridge, however, going outside the chain of command to complain about your supervisor's failure to process raises and conduct annual employee reviews without more is not activity protected either § 1981 or the NJLAD.

Accordingly, Plaintiffs' Motion for Summary Judgment on their retaliation claims is **DENIED**, while Defendants' Motion for Summary Judgment on the retaliation claims is **GRANTED**.

### d.   Aiding and Abetting

Plaintiffs also seek to impose liability on the individual Defendants pursuant to the NJLAD.

The NJLAD provides it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [the act], or to attempt to do so." N.J. Stat. Ann. § 10:5-12(e). Such conduct may result in personal liability. *Tarr v. Ciasulli*, 853 A.2d 921, 928 (N.J. 2004); *See Fasano v. Fed. Reserve Bank of*

*N.Y.*, 457 F.3d 274, 289 (3d Cir. 2006) ("The [NJ]LAD permits the imposition of individual liability on an employee who has aided or abetted barred acts.").

To sustain a claim for aiding and abetting, a plaintiff must establish that:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

*Tarr*, 853 A.2d at 929 (quoting *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 129 (3d Cir. 1999)); *See O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016). However, "for a defendant to be individually liable for aiding and abetting, the employer must also be liable under the [NJ]LAD." *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 463 (D.N.J. 2009). Therefore, because the Court has denied summary judgment to Plaintiffs as to URG as discussed above, it follows that Plaintiffs' Motion for Summary Judgment on the aiding-and-abetting claim also must fail. *Joseph v. New Jersey Transit Rail Operations, Inc.*, No. 12-1600, 2013 WL 5676690, at *13 (D.N.J. Oct. 17, 2013), *aff'd*, 586 F. App'x 890 (3d Cir. 2014). Accordingly, both Motions for Summary Judgment on the aiding-and-abetting claim against the individual defendants are **DENIED**.

### e.  Individual Defendants

Plaintiffs seek to impose liability on the individual Defendants pursuant to § 1981, while Graham separately also seeks such liability under Title VII in Count 12.

The "Third Circuit has ruled that Title VII claims may not be brought against individual defendants." *Saylor v. Delaware Dep't of Health & Soc. Servs., Div. of Child Support Enf't*, 569 F. Supp. 2d 420, 422 (D. Del. 2008) (citing *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552 (3d Cir.1996); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1077 (3d Cir.1996). As

51

a result, Defendants' Motion for Summary Judgment as to Count 12 is **GRANTED**, and Plaintiffs' Motion for Summary Judgment on Count 12 is **DENIED**.

Nonetheless, the Third Circuit "has found individual liability under § 1981 'when [the defendants] intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable.'" *Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001) (citing *Al–Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir.1986); *Santiago v. City of Vineland*, 107 F.Supp.2d 512, 540–41 (D.N.J. 2000).

Plaintiffs' only argument for this Motion regarding individual liability is that Goldszal, Labaska, Jacob and Lynch "are all employees of URG who aid[ed] in the segregation of plaintiffs and disparate treatment that led to the denial of training." (ECF No. 38 at 42.) This argument was in the context of supporting the aiding-and-abetting claim above. (*Id.*)

Defendants argue summary judgment should be granted as to all counts against the individual defendants because Plaintiffs make no showing that these individual Defendants treated Plaintiffs less favorably because they are African-Americans.

The Court agrees Plaintiffs have not produced any evidence demonstrating that the individual Defendants "intentionally cause[d] an infringement of rights protected by Section 1981" as contemplated by *Cardenas*. Accordingly, Plaintiffs' Motion for Summary Judgment on Counts Eleven, Fourteen, and Sixteen is **DENIED**, while Defendants' Motion for Summary Judgment on those same counts is **GRANTED.**

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **DENIED**, and Defendants Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.

**Date: September 22, 2020**                    */s/ Brian R. Martinotti*_____
                                              **HON. BRIAN R. MARTINOTTI**
                                              **UNITED STATES DISTRICT JUDGE**